FILED
CLERK

7/7/2021 6:18 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LORENZO REDD,

                Plaintiff,

       -against-

COUNTY OF NASSAU, ARMOR
CORRECTIONAL HEALTH, INC., CPL RHODES,
CPL MCMILLAN and MICHAEL J. SPOSATO,
SHERIFF,

                Defendants.
-------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
14-CV-01028 (GRB) (JMW)

**WICKS,** Magistrate Judge:

      Plaintiff Lorenzo Redd commenced this action[1] pursuant to 42 U.S.C. § 1983 against Defendant Armor Correctional Health, Inc. ("Armor") and Defendants County of Nassau, CPL Rhodes, CPL McMillan, and Michael J. Sposato, Sheriff (the "County Defendants") alleging, *inter alia*, that Defendants violated his constitutional rights under the Eighth and Fourteenth Amendments by failing to protect him from an inmate attack while incarcerated and by failing to provide him appropriate medical care following the attack. Before the Court on referral from the Honorable Gary R. Brown are Defendant Armor and the County Defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the undersigned respectfully recommends that Defendant Armor and the County Defendants' motions for summary judgment be granted, and the complaint now be dismissed.

---

[1] As discussed *infra*, Plaintiff proceeded through much of this litigation *pro se*, but is currently represented by counsel for the purposes of the present motions.

# FACTUAL BACKGROUND

**Plaintiff's Physical Altercation and Subsequent Medical Treatment**

The following facts are drawn from Defendant Armor's Statement (DE 241-5) and the County Defendants' Statement (DE 246), pursuant to Local Rule 56.1, as well as other evidence supplied in the record.[2] *See Ayazi v. United Fed'n of Teachers Local 2¸* 487 F. App'x 680, 681 (2d Cir. 2012) ("[W]hen assessing a summary judgment motion, a District Court may consider other materials in the record.") (internal quotation marks and citation omitted).

On April 30, 2013, Plaintiff arrived as an inmate at the Nassau County Correctional Center ("NCCC"). (DE 241-5 ¶ 4.) On January 5, 2014, Plaintiff was involved in a physical altercation with two other inmates. (*Id.* ¶ 5.) Corrections Officer ("CO") Lima responded to the fight and after giving verbal commands to cease fighting, the inmates complied. (DE 246 ¶ 10.) As a result of the fisticuffs, Plaintiff sustained multiple injuries—his left ear was bitten off, he had a tooth knocked out, and his cheekbone and eyes were wounded. (DE 241-5 ¶¶ 6, 28; DE 246 ¶ 12.) Following the altercation, NCCC personnel brought Plaintiff to the prison's infirmary and called an ambulance to transport him to the hospital, which arrived approximately fifteen to twenty minutes later. (DE 241-4 at 33:2–20.) The ambulance took Plaintiff to the Nassau University Medical Center ("NUMC") emergency room. (DE 241-5 ¶ 6.) There, NUMC staff diagnosed Plaintiff with a left orbital floor fracture, a severed left ear, and a missing front tooth, and prescribed him Percocet to be taken every six hours as needed. (*Id.* ¶¶ 6–7.) Although they could not stich his ear back on (*id.* ¶ 29), the NUMC staff scheduled Plaintiff a consultation with plastic surgery for January

---

[2] "Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York . . . requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each fact." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003). The "party opposing summary judgment must respond with a statement of facts as to which a triable issue remains. The facts set forth in a moving party's statement will be deemed to be admitted unless controverted by the opposing party's statement." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks and citations omitted); *see Taylor & Fulton Packing, LLC v. Marco Int'l Foods, LLC*, No. 09-cv-2614, 2011 WL 6329194, at *4 (E.D.N.Y. Dec. 16, 2011) ("Where a nonmovant fails to file a [Rule 56.1 Statement], courts frequently deem all supported assertions in the movant's statement admitted and find summary judgment appropriate.") Plaintiff has failed to file an opposing Rule 56.1 Statement. As such, the facts set forth in Defendants' 56.1 Statements that are supported by admissible record evidence are accepted as true. *See Oka v. Cnty. of Suffolk*, No. 11-CV-2578 (SJF), 2015 WL 918762, at *2 n.2 (E.D.N.Y. Mar. 2, 2015).

8, 2014, (DE 241-1 at 68). The discharge paperwork directed Plaintiff to return to NUMC if he experienced any redness or yellow discharge. (*Id.*) That night, Plaintiff returned to the NCCC and was placed in the infirmary. (DE 241-5 ¶ 30.)

On January 8, 2014, Plaintiff had his plastic surgery consultation at NUMC. (*Id.* ¶ 9.) The consultation report noted that Plaintiff required a "CT scan [of his] facial bones," an "ophth[almologist] consult[ation]," and a "dental consult[ation]." (DE 241-1 at 87.) Plaintiff also expressed a desire for ear reconstruction. (*Id.*) NUMC accordingly made referrals to Defendant Armor for Plaintiff to be treated for his eyes, teeth, and cheekbone; however, Defendant Armor only approved the eye and cheekbone treatment. (DE 241-5 ¶ 32.) Defendant denied these referrals because they were not medically necessary. (DE 246 ¶ 19.)

Plaintiff returned to NUMC on January 15, 2014 for an ophthalmologist consultation. (DE 241-5 ¶ 10.) At this point, Plaintiff suffered from severe dry eyes, double vision, and migraine headaches. (*Id.* ¶ 31.) The NUMC staff removed Plaintiff's eye sutures and informed him that he needed cheekbone surgery. (*Id.* ¶ 10.) The staff also checked for a possible dressing change for Plaintiff's ear and noted the need to coordinate with the NCCC nurse to schedule his ear reconstruction surgery. (*Id.*)

On January 27, 2014, Plaintiff underwent cheekbone surgery at NUMC, which consisted of a left infraorbital exploration and the placement of an absorbable plate in his left cheek. (DE 241-5 ¶¶ 11, 32.) Plaintiff returned to the NCCC that day, with discharge instructions directing him to keep his head elevated with two pillows, to ice his eye for twenty minutes three time per day, and to notify NUMC only if he noticed redness in the affected area, non-stop bleeding, or shortness of breath. (*Id.*) The instructions directed NCCC to keep Plaintiff out of general population. (*Id.*) Finally, the instructions indicated that Plaintiff's eye injuries were pre-existing, and that there was evidence of a plate in Plaintiff's right orbit from a previous surgery. (*Id.*) That night, NCCC infirmary staff prescribed Plaintiff Percocet. (DE 241-4 at 96:14–19.) Plaintiff was then given Tylenol rather than Percocet the following morning, despite telling the NCCC infirmary staff that he "was cold, dizzy, fatigued, nauseous, sleepless, [and] couldn't turn [his] face," and therefore "needed some stronger drugs . . . to cope with the pain." (*Id.* at 96:20–24.)

3

Following his cheekbone surgery, Plaintiff frequented NUMC for consultations regarding the condition of his eyes. On March 17, 2014, Plaintiff had another consultation with the plastic surgery department, which noted that Plaintiff suffered from a "[c]hronic injury to his left eye, longstanding prior to [his cheekbone] surgery," but that "[n]o plastic surgery intervention [was] planned for [the] future." (DE 240-1 at 94.) Plaintiff then saw a NUMC ophthalmologist on April 4, 2014 where he complained of continued double and triple vision. (*Id.* at 95.) The ophthalmologist noted that there had been "[n]o intervention by plastics," but referred Plaintiff to the "Strab" clinic for an evaluation. (*Id.*) On May 22, 2014, the "Strab" clinic ophthalmologist stated that Plaintiff should "consider" right eye surgery (*id.* at 96), but it was not until July 1, 2014 that NUMC Doctor Roberts determined that Plaintiff "[n]eed[ed] to be scheduled for strabismus surgery," (*id.* at 97). However, Defendant Armor apparently did not schedule Plaintiff for surgery following this directive, prompting an NUMC ophthalmologist to remind Defendant Amor¸ on August 15, 2014, that it still needed to schedule Plaintiff's surgery. (*Id.* at 98.)

Over two months later, on October 27, 2014, Plaintiff visited NUMC for an assessment prior to his right-eye surgery. (DE 241-5 ¶ 17.) The assessment noted that Plaintiff was scheduled for a [r]ight superior rectus recission 2mm with posterior fixation suture," and that Plaintiff complained of [l]imited left eye upgaze." (DE 242-1 at 6.) Plaintiff then had surgery on his right eye on November 4, 2014. (*Id.* at 7–10.) The nursing preadmission record described the surgery as "[e]lective." (*Id.* at 10.) Plaintiff was fit for confinement as soon as NUMC released him from surgery. (*Id.* at 54.)

Plaintiff—who at this point apparently required additional eye surgeries—then experienced a flurry of operation cancellations. Plaintiff was scheduled to undergo surgery on his left eye on April 7, 2015. (DE 241-5 ¶ 20.) However, this surgery was cancelled by the NUMC operating room and required rescheduling. (DE 242-1 at 66.) Plaintiff's left-eye surgery was then scheduled for May 2, 2015, which was again cancelled because Plaintiff had eaten breakfast that morning. (*Id.* at 67.) Plaintiff was then scheduled for right and left eye surgery on June 2, 2015; this surgery, too, was cancelled due to an error in Plaintiff's pre-operative lab work. (DE 241-5 ¶ 22; *see also* DE 242-1 at 76–77.) Finally, on September 1,

2015, Plaintiff underwent surgery consisting of exploration of the left inferior oblique muscle with dissection performed on his left eye.[3] (DE 241-5 ¶ 24.)

**Plaintiff's NCCC Grievances**

Plaintiff has filed "[o]ver a hundred" grievances during his time as an inmate. (DE 241-4 at 54:11–12.) Plaintiff has only filed, however, five formal grievances concerning the aforementioned physical altercation and subsequent medical care (DE 246 ¶ 20), which Plaintiff filed on February 20, 2014 (DE 241-2 Exh. 2); November 28, 2014 (*id.* Exh. 3); January 18, 2015 (*id.* Exh. 4); March 23, 2015 (*id.* Exh. 15); and April 6, 2015 (*id.* Exh. 17). The record reflects that the New York State Commission of Correction received at least one grievance—the February 20, 2014 grievance—and informed Plaintiff that he followed the correct grievance procedure.[4] (DE 241-2 Exh. 1.) The Court cannot ascertain, however, the full disposition of each grievance based on the record before it.

## PROCEDURAL HISTORY

Plaintiff initiated this action *pro se* by filing a complaint on February 11, 2014. (DE 1.) That day, Plaintiff filed a motion to proceed *in forma pauperis*. (DE 2.) The district court granted that motion on February 26, 2014. (DE 6.) On July 8, 2015, Defendant Armor filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). (DE 28.) The Honorable Joseph F. Bianco referred the motion to the Honorable Gary R. Brown—then a magistrate judge—for a Report and Recommendation. (DE 35.)

On December 15, 2014, Judge Brown issued his Report and Recommendation, recommending that: (1) the motion to dismiss be granted with respect to Plaintiff's Section 1983 claim and declaratory judgment claim against Defendant Armor; (2) Plaintiff be granted leave to amend the complaint to re-pled those claims with more specific factual allegations regarding Defendant Armor's alleged constitutional

---

[3] The September 1, 2015 progress notes state that the "risks, benefits, and alternatives of procedure were discussed" with Plaintiff, "including but not limited to risk of poor post-operative eye alignment, possibly requiring more surgery, diplopia, scleral perforation resulting in possible loss of vision [or the] eye itself, post-operative infections, including endophthalmitis, anterior segment ischemia, lost or slipped muscle, post-operative scarring or the need for more surgery in the future." (DE 242-1 at 88.) Plaintiff nonetheless "expressed understanding and wished to proceed with [the] surgical procedure." (*Id.*)
[4] This letter's reference to the "March 7, 2014 correspondence" pertains to the date that Plaintiff appealed the denial of his February 20, 2014 grievance to the Citizen's Policy and Complaint Review Council. (*See* DE 241-2 Exh. 2.)

violations; and (3) the motion to dismiss Plaintiff's state law claim be denied. (DE 38.) Notably, Judge Brown recommended that Defendant Armor's motion to dismiss, based on Plaintiff's failure to exhaust his NCCC administrative remedies, should be denied because non-exhaustion was not clear from the face of the complaint, and that such dismissal would accordingly be premature at that stage of the litigation. (*Id.* at 5–6.) On January 30, 2015, the district court adopted the Report and Recommendation, granting Plaintiff leave to file an amended complaint. (DE 41.)

On March 6, 2015, Plaintiff filed an amended complaint dated February 26, 2015. (DE 44.) Plaintiff also filed a second amended complaint, dated February 28, 2015, that same day. (DE 45.) On April 14, 2015, Plaintiff requested by letter a telephone conference with the district court to investigate his current medical treatment at the NCCC and to compel Defendants to provide him with his preferred brand of eye drops. (DE 70.) The district court ultimately determined that the requested conference was unnecessary given that Plaintiff failed to make a sufficient showing for injunctive relief concerning his current medical treatment. (DE 71.) The district court additionally granted Plaintiff leave to file a third amended complaint (*id.*), which Plaintiff filed on May 26, 2015. (DE 81.)

On August 31, 2015, Defendant Armor moved to dismiss the Plaintiff's third amended complaint for failure to state a claim.[5] (DE 97.) On November 30, 2015, Plaintiff filed a cross-motion along with his opposition papers, requesting leave to file a fourth amended complaint and appointment of *pro bono* counsel.[6] (DE 105.) Judge Bianco referred these motions to Judge Brown for a Report and Recommendation. (DE 92.)

Judge Brown issued his Report and Recommendation on February 22, 2016, recommending that: (1) the motion to dismiss be granted as to Plaintiff's Section 1983 causes of action; (2) the motion to dismiss be granted as to Plaintiff's claims for declaratory and injunctive relief; (3) the district decline to exercise supplemental jurisdiction on Plaintiff's state law claims, to the extent they existed; and (4) Plaintiff's cross-

---

[5] Notably, Defendant Armor did not move to dismiss based on Plaintiff's failure to exhaust his administrative remedies in this round of motion practice. (*See, e.g.*, DE 97-4.)
[6] Plaintiff initially moved the district court to appoint him counsel on August 13, 2015. (DE 95.) On September 2, 2015, Judge Bianco denied that motion with leave to renew the request at a later stage of the proceedings. (DE 98.)

motion for leave to amend be denied; and (5) Plaintiff's request for appointment of *pro bono* counsel be denied. (DE 107.) On March 21, 2016, Plaintiff filed an objection to the Report and Recommendation (DE 112), and on August 31, 2016, the district court adopted the Report and Recommendation in part, namely, the recommendation that Plaintiff's claims against Defendant Amor for declaratory and injunctive relief be granted, (DE 115). The district court, however, declined to adopt the remaining recommendations, allowing Plaintiff's Section 1983 claims and state law claims against Defendant Armor to proceed, and granting Plaintiff leave to file a fourth amended complaint.[7] (*Id.*) Further, the district court held that it was "willing to re-visit" Plaintiff's request for appointment of *pro bono* counsel, and would discuss the matter with the parties at a later date. (*Id.* at 10.)

Plaintiff was subsequently appointed *pro bono* counsel. (*See* DE 118.) Discovery proved, however, to be fraught with issues between Plaintiff and appointed counsel. On May 8, 2017, Plaintiff began filing letters with the district court recounting his current medical issues and expressing his dissatisfaction with his counsel, going as far as filing a "motion for accelerated judgment" on his own. (*See* DE 122–127.) On July 20, 2017, Plaintiff's counsel requested a pre-motion conference for permission to withdraw based on a conflict of interest. (DE 130.) On July 27, 2017, following a telephone conference, the district court granted Plaintiff counsel's motion to withdraw and stayed the proceedings to determine whether Plaintiff would be appointed new counsel. (DE 133.)

On August 17, 2017, new counsel was appointed to represent Plaintiff. (DE 135.) Similarly, this attorney-client relationship quickly deteriorated. (*See, e.g.*, DE 145, 149.) On March 12, 2018, Plaintiff filed on his own a motion to be appointed new *pro bono* counsel. (DE 150.) Given the apparent issues between Plaintiff and his counsel, Judge Brown held a conference on April 16, 2018 to discuss the viability of the attorney-client relationship. (Electronic Order dated April 16, 2018.) Judge Brown ultimately determined that *pro bono* counsel would continue their representation of Plaintiff. (*Id.*) Plaintiff, however, continued to demand new *pro bono* counsel or, alternatively, to proceed *pro se*. (*See, e.g.*, DE 156, 158–

---

[7] As discussed below, Plaintiff ultimately never filed a fourth amended complaint, making the third amended complaint the operative complaint in this action.

159, 161.) Plaintiff's counsel agreed that the relationship had become "irreparably fractured" and requested permission to withdraw. (DE 160.) On October 23, 2018, Judge Brown granted Plaintiff counsel's motion to withdraw and extended all discovery deadlines for sixty days to permit Plaintiff to secure new counsel, noting that Plaintiff should be prepared to proceed *pro se* if counsel could not be obtained in that period. (Electronic Order dated October 23, 2018.) Plaintiff did not obtain counsel within the allotted sixty-day period, and proceeded with the litigation *pro se*. (*See* Electronic Order dated November 28, 2018.) Plaintiff did, however, ultimately obtain counsel on December 3, 2019, who continues to represent Plaintiff to date.

As discussed above—Plaintiff was granted on August 31, 2016, leave to file a fourth amended complaint—however, Plaintiff waited until September 7, 2017, over a year later, to file a "Notice of Supplemental Claim to Original Complaint." (DE 139.) The district court then granted Defendants' motion to strike that notice on September 14, 2018 and informed Plaintiff that—at that point in the litigation—leave was required to amend his complaint. (DE 157.) On April 18, 2019, Plaintiff then filed a motion for leave to amend his third amended complaint. (DE 191.) Both Defendant Amor and the County Defendants filed oppositions. (DE 192, 196.) On May 31, 2019, this case was reassigned to the Honorable Joanna Seybert (Electronic Notice dated May 31, 2019), who referred Plaintiff's motion to amend to Judge Brown for a Report and Recommendation. (Electronic Order dated October 8, 2019.) On October 10, 2019, Judge Brown recommended that Plaintiff's motion be denied on statute of limitations grounds. (Electronic Order dated October 10, 2019.) Plaintiff objected to the Report and Recommendation on December 2, 2019. (DE 223.) Judge Seybert, however, adopted the Report and Recommendation in full, denying Plaintiff's request for leave to file a fourth amended complaint and noting that Plaintiff's third amended complaint was the operative complaint in this action. (DE 227.) On December 19, 2019, Judge Brown was confirmed as a United States District Judge; this case was then reassigned to him in that capacity. (Electronic Notice dated January 31, 2020.)

Defendant Armor and the County Defendants now move for summary judgment, seeking to dismiss Plaintiff's Section 1983 deliberate indifference claims. (DE 241, 245.) Additionally, Defendant Armor moves for summary judgment on Plaintiff's state law medical malpractice claim, to the extent it still exists.

8

(DE 241.) Plaintiff opposes those motions. (DE 241-8, 249.) The district court referred the motions to the Honorable Magistrate Judge Steven Locke for a Report and Recommendation. (Electronic Order dated April 16, 2021.) This case—along with the Report and Recommendation referral—was then reassigned to the undersigned. (Electronic Notice dated May 13, 2021.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movants to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movants meet their initial burden, the nonmovant may defeat summary judgment only be adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the nonmovant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the nonmovant must still do more than merely assert conclusions that are unsupported by arguments or fact, *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

Plaintiff's third amended complaint alleges, under Section 1983, violations of his constitutional rights under the Eighth and Fourteenth Amendments based on Defendants' failure to protect him from the inmate attack and for failure to provide him appropriate medical care following the attack. (DE 241-2.) As discussed more fully below, *see infra* at 16, the third amended complaint also may allege a state law claim against Defendant Armor for medical malpractice. (*Id.*)

**Section 1983**

Section 1983 of Title 42 of the United States Code states that:

> Every person who, under color of any statue, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. Section 1983 itself does not create substantive rights, "but rather provides a vehicle by which parties can seek redress for violations of their federally guaranteed rights." *Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406, 416–17 (E.D.N.Y. 2009) (citing *Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005)). To prevail on a claim under Section 1983, the plaintiff must show that the challenged conduct (1) was "committed by a person acting under color of state law"; and (2) "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (internal quotation marks omitted).

**The Prison Litigation Reform Act**

Defendants contend that summary judgment is appropriate here because, under the Prison Litigation Reform Act ("PLRA"), Plaintiff failed to exhaust his NCCC administrative remedies and is therefore barred from continuing this Section 1983 suit in federal court. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[8] *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It is well settled that "exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citation omitted). The purpose of the PLRA is "to reduce the quantity and improve the quality of prisoner suits . . . [and to afford]

---

[8] The PLRA applies to actions involving alleged constitutional violations based on failure to administer proper medical care in prison. *See, e.g.*, *Hernandez v. Doe 1-7*, 416 F. Supp. 3d 163, 166–167 (E.D.N.Y. 2018) (dismissing complaint, which alleged that incarcerated Plaintiff was denied proper medical care, for non-exhaustion under the PLRA); *Neal v. Goord*, 267 F.3d 116, 119–20 (2d Cir. 2001) (considering prisoner's Section 1983 suit alleging inadequate medical treatment as "ordinary garden variety complaints about prison conditions" and thus subject to the PLRA).

10

corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004) (quoting *Porter*, 534 U.S. at 524–25) (internal quotation marks omitted); *see Woodford v. Ngo*, 548 U.S. 81, 93–94 (2006) ("The PLRA also was intended to reduce the quantity and improve the quality of prisoner suits.") (internal quotation marks omitted). Accordingly, failure to exhaust administrative remedies under the PLRA is an affirmative defense that is properly resolved at the summary judgment stage. *See Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) ("Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement."); *Dabney v. Pegano*, 604 F. App'x 1, 4–5 (2d Cir. 2015) (affirming district court's grant of summary judgment based on plaintiff's failure to exhaust administrative remedies) (summary order).

In considering administrative exhaustion, "[i]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Hayes v. Dahlke*, 976 F.3d 259, 268 (2d Cir. 2020) (quoting *Jones*, 549 U.S. at 218) (internal quotation marks omitted). As highlighted by Defendant—and as other courts have acknowledged—the New York State Department of Correction and Community Supervision follows a three-step grievance procedure for inmates:

> (1) The grievance is investigated and reviewed by the inmate grievance resolution committee ("IGRC"); (2) if appealed, the superintendent of the facility reviews the IGRC'S determination; and (3) if the superintendent's decision is appealed, the Central Office Review Committee makes the final administrative determination.

(DE 231-6 at 13 (citing *Saunders v. Goord*, 98-CV-5056 (LMM), 2002 U.S. Dist. LEXIS 18189, at *10 (S.D.N.Y. Sept. 26, 2002)); *see Walker v. Cnty. of Nassau*, 15-CV-4794 (JFB) (SIL), 2016 WL 11481725, at *4 (E.D.N.Y. Aug. 8, 2016) (same), *report and recommendation adopted by* 2016 WL 5338546 (E.D.N.Y. Sept. 22, 2016).)[9] While "the grievance procedure in place at the NCCC is separate from the grievances procedure implemented by the New York State Department of Correction and Community

---

[9] Because New York's grievance procedures are a matter of public record, the Court takes judicial notice of them, despite their absence in the record. *See Jhagroo v. Carty*, 17-CV-3416 (PKC) (SJB), 2019 WL 1922287, at *2 (E.D.N.Y. Apr. 29, 2019) (citing *Rayside v. City of N.Y.*, No. 17-CV-4447 (RA), 2019 WL 1115669, at *2 n.1 (S.D.N.Y. Mar. 11, 2019)).

Supervision, . . . courts have observed that (1) New York State's procedure for handling inmate grievances generally mirrors Nassau County's procedure[;] and (2) courts consistently have accepted the provisions of NCCC's grievance procedure in adjudicating prisoner claims." *Walker*, 2016 WL 11481725, at *4 n.2 (citing *Abney v. Cnty. of Nassau*, 237 F. Supp. 2d 278, 283 (E.D.N.Y. 2002); *Young v. Sposato*, No. 12-CV-2850, 2014 WL 109083, at *5 n.6 (E.D.N.Y. Jan. 13, 2014)).

It is undisputed that Plaintiff failed to exhaust his administrative remedies prior to commencing this action. The altercation giving rise to this lawsuit—where two inmates attacked and injured Plaintiff—occurred on January 5, 2014 (DE 241-5 ¶ 5), with the allegedly deficient medical treatment taking place from that point forward. Plaintiff filed his initial complaint on February 11, 2014. (*See* DE 1.) Although Plaintiff filed five grievances relating to the physical altercation and subsequent medical treatment (DE 246 ¶ 20), it was not until February 20, 2014—nearly two weeks *after* initiating this lawsuit—that Plaintiff filed his first grievance regarding these events.[10] (*See* DE 241-2 ¶ 13; *see also id.*, Exh. 2 (grievance form dated February 20, 2014).) Indeed, Plaintiff testified that he "amended everybody" on his docket—indicating that this action was already underway—*after* the denial of his grievances. (DE 241-4 at 54:18–25; 55:1–25; 56:1–6.)

Plaintiff does not flatly dispute that he failed to exhaust his administrative remedies prior to commencing this action. (DE 241-8 at 3–4.) Rather, Plaintiff attempts to navigate his way around this procedural obstacle by asserting that he "plausibly . . . followed all internal grievance procedures to the best of his ability" and "attempt[ed] to comply with such procedures at an earlier time," despite the fact that "plaintiff's attachments reflect that one or more grievances or grievance decisions [followed] the commencement of this action." (*Id.*) But the only inquiry on summary judgment is whether a genuine dispute of material fact exists. *Anderson*, 477 U.S. at 248. Issue identification, rather than resolution, is

---

[10] In his initial complaint, Plaintiff alleged that he "[f]iled a grievance," which was denied. (DE 1 at 2.) However, it is clear from the complaint that Plaintiff did not raise the same allegations as here; rather, Plaintiff alleged that he "contacted internal [a]ffairs and told them [he] wanted to press charges against [his] assailants," which resulted in internal affairs informing Plaintiff that "they would not file charges against inmates assaulting other inmates." (*Id.*) In any event, there is no evidence that Plaintiff exhausted his administrative remedies as to that grievance.

12

the goal. *See Bacchus Assocs. v. Hartford Fire Ins. Co.*, 766 F. Supp. 104, 111 (S.D.N.Y. 1991) ("[T]he district court may only identify the issues at the summary judgment stage, not resolve them.") (citation omitted). Defendants have met their burden by pointing to Plaintiff's own documents evidencing that Plaintiff waited until after the commencement of the present suit to file any internal grievances. Plaintiff, on the other hand, has not come forward with any evidence showing that he initiated—let alone exhausted— his administrative remedies prior to filing this action. *See Kasiem v. Switz*, 756 F. Supp. 2d 570, 576 (S.D.N.Y. 2010) (granting summary judgment for failure to exhaust where plaintiff's claims were never exhausted or became fully exhausted months after Plaintiff filed suit). But that does not end the inquiry.

The PLRA "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief," and thus cannot operate as an affirmative defense under the PLRA. *Id.* at 1858–59; *see Taylor v. N.Y. City Dep't of Corr.*, No. 19-256, 2021 WL 852067, at *2 (2d Cir. Mar. 8, 2021) ("Prisoners need not comply with the exhaustion requirement, however, when administrative remedies are 'unavailable.'") (summary order). Such circumstances exist when:

> (1) the grievance process operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) the process is so opaque that it becomes, practically speaking, incapable of use; or (3) prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Rucker v. Giffen*, 997 F.3d 88, 93 (2d Cir. 2021) (quoting *Ross*, 136 S. Ct. at 1859–60) (internal quotation marks omitted).

The evidence in the record makes clear that none of the circumstances giving rise to an exception to the PLRA's mandatory exhaustion requirement outlined in *Ross* exists here. First, documents appended to Plaintiff's third amended complaint prove that the NCCC's grievance process does not operate as a simple dead end. Specifically, the March 19, 2014 letter from the State Commission of Correction states that Plaintiff "followed the correct procedure by filing a grievance" and that he should "await a decision from the Citizen's Policy and Complaint Review Council." (DE 241-2 Exh. 1.) Moreover, the July 15,

13

2014 letter from the State Commission of Correction informed Plaintiff that "[t]he Citizens Policy and Complaint Review Council ha[d] reviewed [his grievance and] voted to deny" it. (*Id.* Exh. 7.) These letters show that the Review Council has a system in place to provide relief for aggrieved inmates—and thus does not operate as a simple dead end—and reviewed and ultimately denied Plaintiff's grievance.

Second, the record indicates that the NCCC's grievance procedure is not "so opaque that it becomes, practically speaking, incapable of use" for the same reasons. *Ross*, 136 S. Ct. at 1859–60. Given that Plaintiff submitted at least three grievances following the commencement of this lawsuit, Plaintiff was fully aware of the NCCC's grievance procedure and was capable of taking advantage of it. (*See* DE 241-2 Exhs. 2–6; DE 241-4 at 54:25 (Plaintiff noting that he filed "[t]hree or four or five" grievances with respect to this incident); *see also* DE 241-4 at 54:25 (Plaintiff noting that he has filed "[o]ver a hundred" grievances).) As discussed above, the State Commission of Correction even notified Plaintiff that he "followed the correct procedure by filing a grievance." (DE 241-2 Exh. 1.) In short, Plaintiff's frequent and informed use of the NCCC's grievance procedure forecloses the prospect that the procedure was so opaque that it became incapable of use. *See Williams v. Sposato*, No. 13-CV-4247 (SJF) (ARL), 2019 WL 5310222, at *8 (E.D.N.Y. Oct. 21, 2019) (granting summary judgment where, among other things, no rational jury could reasonably find "that the NCCC's grievance process was not discernible or navigable to the ordinary prisoner").

Finally, there is no evidence that prison administrators prevented Plaintiff from filing grievances through "machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60. Indeed, Plaintiff does not identify—in his third amended complaint, opposition papers, or elsewhere—any action on the part of prison administrators that prevented him from filing grievances. *Cf. Grafton v. Hesse*, No. CV 15-4790 (SJF) (GRB), 2017 WL 9487092, at *8 (E.D.N.Y. Aug. 25, 2017) (finding "no basis for excusing plaintiffs' failure to exhaust" where plaintiffs "failed to allege that administrative remedies were actually unavailable to them") (citing *Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016)), *report and recommendation adopted by* 2017 WL 4286266 (E.D.N.Y. Sept. 27, 2017). And, even assuming such allegations existed, the fact that Plaintiff filed numerous grievances concerning the events giving rise to this lawsuit proves that

14

the NCCC's administrative remedies were not unavailable as contemplated by *Ross*. *See Grafton v. Hesse*, 783 F. App'x 29, 31 (2d Cir. 2019) ("We have held that where there has been no affirmative action by prison staff actually preventing prisoners from pursuing administrative remedies, those remedies are not unavailable under the PLRA.") (citing *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006)) (summary order). Thus, Plaintiff cannot be excused from the exhaustion demands of the PLRA due to the absence of any nefarious conduct on the part of NCCC administrators.

Plaintiff's argument attempting to justify his failure to exhaust is unpersuasive. Plaintiff contends that Defendants "have not shown that regular grievance mechanisms were accessible to [P]laintiff and that, assuming they were, . . . [D]efendants' own actions did not obstruct his ability to comply with the PLRA. (DE 241-8 at 3 (emphasis removed).) But the record makes clear that Plaintiff had meaningful access to NCCC's grievance system, and that no such existential impediment existed to prevent Plaintiff from availing himself of it. Such conclusory statements unsupported by fact do not operate to create the genuine dispute of material fact required to survive summary judgment. *W.R. Grace & Co.*, 77 F.3d at 615.

In sum, given that there is no genuine dispute that Plaintiff failed to exhaust his available NCCC administrative remedies as required by the PLRA, and in the absence of any justification for not pursuing such remedies, summary judgment is appropriate here. "While such a remedy may appear harsh, the law is clear" that failure to exhaust one's available administrative remedies precludes the ability to bring an action under Section 1983. *Walker v. Cnty. of Nassau*, No. 15-CV-4794 (KAM) (ST), 2021 WL 355151, at *4 (E.D.N.Y. Feb. 2, 2021). Accordingly, the undersigned respectfully recommends that Defendants' motions for summary judgment be granted.

**Supplemental Jurisdiction**[11]

Federal courts "may decline to exercise supplemental jurisdiction over [pendant state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. §

---

[11] In his prior Report and Recommendation, and only "out of an abundance of caution," Judge Brown considered whether the exercise of supplemental jurisdiction should be recommended despite Plaintiff's failure to set forth in his third amended complaint a state law claim for medical malpractice against Defendant Amor as asserted in his initial complaint. (DE 109 at 29.) This Court takes the same approach here.

1367(c)(3). "Indeed, the Supreme Court has directed that, except in unusual circumstances, 'if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claim should be dismissed as well.'" *Rosa v. Triborough Bridge & Tunnel Auth.*, No. 18-cv-1384 (BMC), 2019 WL 3718023, at *4 (E.D.N.Y. Aug. 7, 2019) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1996)); *see also Schiffman v. Epstein*, No. 04-cv-2661 (SCR) (LMS), 2009 WL 1787760, at *7 (S.D.N.Y. June 23, 2009) ("The strong preference in this Circuit is for district courts to decline to exercise supplemental jurisdiction under § 1367(c)(3) when all of the federal claims are dismissed from the suit prior to trial."). Courts should balance the "values of judicial economy, convenience, fairness, and comity" in considering whether to exercise supplemental jurisdiction. *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). These factors, on balance, weigh against exercising supplemental jurisdiction where no federal claims remain before trial. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350 n.7).

In light of the recommended dismissal of Plaintiff's federal claims, the undersigned finds that judicial economy, convenience, fairness, and comity weigh against exercising supplemental jurisdiction over any remaining state law claim, to the extent they exist. Therefore, the undersigned respectfully recommends that the district court decline to retain supplemental jurisdiction over any of Plaintiff's remaining state law claims.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' summary judgment motions be granted in their entirety and the third amended complaint be dismissed.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to

the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir.2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated: Central Islip, New York
July 7, 2021

/s/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge